UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| VERMONT MUTUAL INSURANCE COMPANY, | ) | CIVIL ACTION |
| as subrogee of TIMOTHY D. STEIN and | ) | |
| WAYNE ROLF | ) | NO. 05-10307 JLT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID'S FLOOR SERVICE, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| and | ) | |
| | ) | |
| MIN DANG, d/b/a | ) | |
| DAVID'S FLOOR SERVICE, | ) | |
| | ) | |
| Defendants/Third Party Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MUOI BUI, a/k/a MUOI PHAM, | ) | |
| as Administratrix of the Estate of | ) | |
| Toan Bui, d/b/a BLESS HARDWOODS | ) | |
| | ) | |
| Defendant/Third Party Defendant. | ) | |

PLAINTIFF'S MOTION FOR LEAVE
TO SERVE REQUEST FOR ADMISSIONS

I.     **INTRODUCTION**

This action involves the responsibility for the explosion and fire that destroyed the property at 4 Foskett Street, Somerville, Massachusetts, as well as resulted in the death of two of the workers at the property, who were applying Harco lacquer sealer at the time of the explosion. Plaintiff seeks recovery of its subrogated interest from David's Floor Service, Inc., the entity re-finishing the floors at the time of the explosion. Plaintiff deposed the owners of David's Floor Service, Min and David Dang, through a Vietnamese interpreter. At these depositions, defendant's counsel sought to restrict the deponent's answers, based upon an alleged privilege.

See Min Dang transcript, p. 79, attached hereto as Exhibit "A". Thereafter, defendant's counsel withdrew its claim of privilege, and agreed to reproduce the witnesses, for completion of their testimony.

In an effort to avoid the expense of such steps, including the need for counsel to travel from out of state and the engagement of an interpreter, Plaintiff's counsel served Request for Admissions, based upon the deposition testimony, in an effort to alleviate the need for any re-deposition, narrow the issues, and facilitate the efficient resolution of this matter, on its merits. See Requests for Admission attached hereto as Exhibit "B". However, Defendant's counsel objected to each of these requests, citing the absence of the Court's leave to conduct this type of discovery. See Defendant's Answer attached hereto as Exhibit "C". Accordingly, having sought to resolve the issue without a motion, Plaintiff now seeks leave to submit Requests for Admission. [See e-mail dated May 12, 2006 attached hereto as Exhibit "D"].

## II.    ANALYSIS

### A. Plaintiff Should be Granted Leave to Submit Request for Admissions to Avoid Needless Expenses and Facilitate the Efficient Resolution of Meritorious Claims.

Given the unfortunate loss of life, numerous public organizations, including OSHA, the Massachusetts State Police, Somerville Police and Fire, and the Middlesex District Attorney's Office investigated the loss. As demonstrated through the testimony of lead public investigator, State Police Fire Marshal Cummings, and confirmed by Plaintiff's independent cause and origin expert, no dispute exists that the improper use of extremely volatile Harco sealer, without the required safety precautions, caused the explosion. See State Police Report, attached hereto as Exhibit "E" and NEFCO report attached hereto as Exhibit "F." Indeed, this regrettable incident represents the second or third circumstance where employees and/or

contractors of David's Floor have caused an explosion, through the improper use of Harco lacquer sealant.

Through its third-party action, as well the declaratory judgment action filed by its insurer, Essex Insurance Company, in state court, the issue of the worker's employment status has been raised.  However, in this case, the issue is not relevant, given the absence of any disclosure by Defendant David's Floor Service regarding its use of alleged subcontractors and/or the particular risk of fire and explosion arising from the application of this Harco sealer.  See Harkins v. Colonial Floor, Inc., 1998 W.L. 22075, at *5  (Mass. Super. 1998) (holding general contractor responsible for negligence of undisclosed subcontractors); Vertentes v. Barletta Co, Inc., 392 Mass. 165, 168-69, 466 N.E.2d 500 (1984) (discussing contractor's responsibility for inherently dangerous work performed by subcontractors).

The Request for Admission are  tailored based upon the prior deposition testimony and the above-cited precedent.  As such, the efficient disposition of this matter, by way of summary judgment and/or trial, will be served by allowing Plaintiff leave to serve Request for Admissions.  Further, the Request for Admissions should avoid the need for any re-depositions, thereby avoiding a cost that has been unnecessarily created by Defendant's assertion of an unsupportable privilege.

## III.    CONCLUSION

WHEREFORE, Plaintiff respectfully requests the Court grant Leave for the Service of its Request for Admissions, to be answered in a full and complete manner, or before

June 16, 2006, as the Requests were served via Federal Express on May 8, 2006 and the Dangs'

depositions are scheduled to be reconvened on June 19, 2006.

Plaintiff Vermont Mutual Insurance Company
a/s/o Timothy D. Stein and Wayne Rolf,
By Its Attorneys,


/s/ *James P. Cullen, Jr., Esquire*
JAMES P. CULLEN, JR., ESQUIRE
COZEN O'CONNOR
1900 Market Street
The Atrium - Third Floor
Philadelphia, PA  19103
(215) 665-4102

CO-COUNSEL:
PATRICK J. LOFTUS, III, ESQUIRE
BBO #303310
No. 9 Park Street
Suite 500
Boston, MA  02108
(617) 723-7770

## **CERTIFICATE OF SERVICE**

I, James P. Cullen, hereby certify that I served a true and correct copy of the foregoing

Motion for Leave to Serve Request for Admissions was served this 16th day of May, 2006, by

electronic filing upon the following parties:

Susan Johnson Bowen, Esquire
Warren, Hensley & Bowen LLP
185 Devonshire Street
Suite 1000
Boston, MA  02110

Timothy M. Roche, Esquire
Monahan & Associates, P.C.
113 Union Wharf East
Boston, MA  02109

/s/ *James P. Cullen, Jr., Esquire*
JAMES P. CULLEN, JR., ESQUIRE

1

Volume:   1

Pages:    1-136

Exhibits: 2-7

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10307JLT

- - - - - - - - - - - - - - - - - -

VERMONT MUTUAL INSURANCE COMPANY

a/s/o TIMOTHY D. STEIN and WAYNE ROLF,

    Plaintiffs

vs.

DAVID'S FLOOR SERVICE, INC., and

MIN DANG, d/b/a DAVID'S FLOOR SERVICE,

    Defendants

- - - - - - - - - - - - - - - - - -

DEPOSITION OF MIN DANG

August 24, 2005

9:50 a.m.

Warren Hensley & Bowen

185 Devonshire Street

Boston, Massachusetts

Reporter:  Taryn M. Gutoff

**Min Dang**
**August 24, 2005**

79

1    Q.   Did you ever appear at any OSHA hearings?

2         MR. BERGER:   Could I just ask that we

3    suspend the deposition for a minute?

4         (Off the record.)

5         MR. CULLEN:   Back on the record.   With

6    regard to some of the disclosure that was given

7    today, there is an issue as to OSHA

8    investigations/allegation/settlement that has come

9    up today.   Counsel for David's Flooring corporately

10   has raised an issue as to whether or not those are

11   fair game for purposes of discovery.   I believe all

12   counsel here today have agreed that we will suspend

13   on the OSHA issue as it's newly raised.   We will

14   bring it up at some later point in time.   And if it

15   is either the subject of motion practice or

16   agreement to the extent Mr. Dang has to come back in

17   and answer questions regarding OSHA, be it for this

18   incident or prior ones, we can cross that bridge

19   when we get to it.

20        MR. BERGER:   Fair enough.

21        MS. BOWEN:   That's fair.

22   Q.   Having said that, sir, we'll move on from

23   OSHA.   Continuing on in this package of materials, I

24   see an invoice from Capital Wood Flooring Supply

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| VERMONT MUTUAL INSURANCE COMPANY, <br> as subrogee of TIMOTHY D. STEIN and <br> WAYNE ROLF | ) <br> ) <br> ) | CIVIL ACTION <br><br> NO. 05-10307 JLT |
| | ) | |
| Plaintiff, | ) <br> ) | |
| | ) | |
| v. | ) <br> ) | |
| | ) | |
| DAVID'S FLOOR SERVICE, INC., | ) <br> ) | **JURY TRIAL DEMANDED** |
| | ) | |
| and | ) <br> ) | |
| | ) | |
| MIN DANG, d/b/a <br> DAVID'S FLOOR SERVICE, | ) <br> ) <br> ) | |
| | ) | |
| Defendants/Third Party Plaintiffs, | ) <br> ) | |
| | ) | |
| and | ) <br> ) | |
| | ) | |
| MUOI BUI, a/k/a MUOI PHAM, <br> as Administratrix of the Estate of <br> Toan Bui, d/b/a BLESS HARDWOODS | ) <br> ) <br> ) <br> ) | |
| | ) | |
| Defendant/Third Party Defendant. | ) | |

**PLAINTIFF'S REQUEST FOR ADMISSION DIRECTED TO
DEFENDANTS DAVID'S FLOOR SERVICE AND MIN DANG**

**DEFINITIONS**

1)      "Property" as used herein shall refer to the entire 3 story building at

4 Foskett Street, in Somerville, Massachusetts.

2)      "Fire" and "Explosion" as used herein shall refer to the events at the

property on September 2, 2004.

1.    David Dang was a full-time employee of David's Floor Service, Inc. between 2001 and the date of the fire.

**RESPONSE:**


2.    In order to give competent testimony, under oath, David Dang requires the services of a Vietnamese interpreter.

**RESPONSE:**


3.    Min Dang was a full-time employee of David's Floor Service, Inc., between 2003 and the date of the fire.

**RESPONSE:**


4.    Throughout 2004, Min Dang owned 50% and David Dang, his father, owned 50% of David's Floor Service, Inc.

**RESPONSE:**

5.    Throughout 2004, David's Floor Service, Inc. held itself out as possessing expertise in hard wood floor sanding and re-finishing.

**RESPONSE:**

6.    Throughout 2004, David's Floor Service, Inc authorized and utilized the Yellow Page advertisement attached hereto as Exhibit "1".

**RESPONSE:**

7.    In the days before the fire, David's Floor Service, Inc. was contacted by Mr. Timothy Stein concerning refinishing third story hard wood floors and staircases at the property.

**RESPONSE:**

8.    Prior to the fire, David Dang never spoke with Timothy Stein.

**RESPONSE:**

9.    Prior to the fire, all of David's Floor Service, Inc's contact with Timothy Stein was done exclusively through Min Dang, acting in his capacity as an employee of David's Floor Service, Inc. [hereinafter the "discussion"].

**RESPONSE:**

10.    Based upon the discussion, David's Floor Service, Inc. agreed to refinish the third story hardwood floors and stairwells at the property ["services"].

**RESPONSE:**

11.    During the discussion, David's Floor Service, Inc. never explained to Mr. Stein that the individuals who would be performing the services at the property may not be employees of David's Floor Service, Inc.

**RESPONSE:**

12.    During the discussion, David's Floor Service, Inc. never explained or raised the issue of the use of independent crews and/or field supervisors to Mr. Stein.

**RESPONSE:**

- 4 -

13.    David's Floor Service, Inc.'s services at the property were to be provided over a two day period.

**RESPONSE:**

14.    On day one, David's Floor Service, Inc.'s services included sanding, vacuuming and priming, with a Harco lacquer sealer, allowing approximately a 45 minute waiting period for drying, then applying an initial coat of oil based polyurethane.

**RESPONSE:**

15.    On day one of the services, the fire/explosion occurred at the property.

**RESPONSE:**

16.    The fire/explosion occurred due to the ignition of Harco lacquer sealer and/or its vapors.

**RESPONSE:**

17.    To refinish floors, utilizing an oil-based polyurethane, a lacquer sealer becomes necessary to complete the services.

**RESPONSE:**

18.    At the time of the explosion, David's Floor Service, Inc. was aware of the means to refinish floors, without utilizing a lacquer sealer.

**RESPONSE:**

19.    To refinish floors, without utilizing a lacquer sealer, David's Floor Service, Inc. could use a water-based polyurethane.

**RESPONSE:**

20.    David's Floor Service, Inc. did not discuss or disclose to Tim Stein the difference between floor refinishing utilizing oil and/or water based polyurethane.

**RESPONSE:**

- 6 -

21.    The oil-based polyurethane costs approximately $12 a gallon, while the water-based polyurethane costs approximately $42 a gallon.

**RESPONSE:**

22.    Prior to applying the lacquer sealer, David's Floor Service, Inc. should have opened all the windows in the third floor of the property.

**RESPONSE:**

23.    Prior to applying the lacquer sealer at the property, David's Floor Service, Inc. acknowledges all the pilot lights on the third floor of the property should have been extinguished.

**RESPONSE:**

24.    Prior to applying the lacquer sealer at the property, David's Floor Service, Inc. acknowledges all electrical devices on the third floor of the property should have been unplugged and/or de-energized.

**RESPONSE:**

25.    Prior to applying the lacquer sealer, in the ordinary course of its business, David's Floor Service would <u>not</u> have terminated all building electric at the property.

**RESPONSE:**

26.    Prior to applying the lacquer sealer, in the ordinary course of its business, David's Floor Service, Inc. would not have unplugged all electrical devices on the first story, second story, and/or attic of the property.

**RESPONSE:**

27.    At the time of the fire David's Floor, Inc. utilized two full time and one part time crews, each consisting of two or more people.

**RESPONSE:**

28.    At the time of the fire, Toan Bui was a field supervisor on one of the full-time crews.

**RESPONSE:**

29.    On the day of the fire, David's Floor Service, Inc. had a four man crew working at the property, which included Toan Bui, as a field supervisor.

**RESPONSE:**


30.    Prior to the fire, David's Floor Service, Inc. understood that all four members of its crew working at Stein's property could not read English.

**RESPONSE:**


31.    Prior to the fire, when communicating with the four crew members, David's Floor Service, Inc. would utilize Vietnamese, as it was each of the crew member's primary language.

**RESPONSE:**


32.    At the time of the fire, David's Floor Service, Inc. understood all four crew members had extremely limited, if any, ability to converse or speak in English.

**RESPONSE:**

- 9 -

33.    At the Stein property, David's Floor Service, Inc.'s crew was using Harco lacquer sealer.

**RESPONSE:**

34.    The true and correct copy of the instructions and warnings on the Harco can are attached hereto as Exhibit "2".

**RESPONSE:**

35.    After the fire, the Massachusetts State Police investigated the explosion and fire, including consulting with Min and David Dang.

**RESPONSE:**

36.    During the state police investigation, Min and David Dang and/or David's Floor Service, Inc. never produced its "Fire and Health Safety Provisions" ["Safety Provisions"] annexed hereto as Exhibit "3".

**RESPONSE:**

37.    David's Floor Service, Inc.'s Safety Provisions do <u>not</u> reference disconnecting power to the building, terminating all building electric, and/or terminating any pilot lights.

**RESPONSE:**

38.    Prior to the explosion, David's Floor Service, Inc., through Ming and David Dang, reviewed the MSDS sheets for the Harco lacquer sealer utilized at the property. [See Exhibit 4].

**RESPONSE:**

39.    Prior to the fire, David's Floor Service, Inc., through Ming and David Dang, read the warnings contained on the Harco lacquer sealer utilized at the property.

**RESPONSE:**

40.    David's Floor Service, Inc. alleges it gave the "Safety Provisions" to Toan Bui, prior to the fire.

**RESPONSE:**

41.    David's Floor Services, Inc. alleges it discussed safety issues concerning the application of Harco Sealer with Toan Bui, prior to the fire.

**RESPONSE:**

42.    In connection with the alleged discussions with Toan Bui, David's Floor Service, Inc. supposedly warned Toan Bui to open windows, turn off pilot lights, and unplug all electrical devices on the story where the Harco lacquer sealer was being applied, but did not discuss terminating all electric and/or pilot lights within the property.

**RESPONSE:**

43.    At all times material hereto, David's Floor Service, Inc. recognized the Harco sealer was the most flammable of the chemicals used during its services at the property.

**RESPONSE:**

44.    Unless the steps were taken on the Safety Provisions were followed,

David's Floor Service, Inc. was aware of the risk of ignition/explosion from the use of Harco

lacquer sealer.

**RESPONSE:**

45.    Prior to the Stein incident, David's Floor Service, Inc. experienced the

ignition of Harco lacquer sealer, in connection with a job at the Prudential Center, in or about

August of 2003.

**RESPONSE:**

46.    In connection with their services at the property, David's Floor Service,

Inc. did not terminate power to the circuit breaker box.

**RESPONSE:**

47.    In the ordinary course of providing its services at the property, David's Floor Service, Inc. would <u>not</u> have expected Toan Bui to terminate power to the entire building at the breaker box, before applying the lacquer sealer.

**RESPONSE:**

48.    David's Floor Service, Inc. knew that, during the application of the Harco sealer, any energized electrical device on the third floor represented a potential ignition source for lacquer sealer vapors.

**RESPONSE:**

49.    David's Floor Service, Inc. was aware the Harco lacquer sealer was very flammable.

**RESPONSE:**

50.    David's Floor Service, Inc. acknowledges that all the points in its Safety Procedure needed to be fully complied with in order to prevent the risk of fire and explosion during the application of the Harco lacquer sealer.

**RESPONSE:**

- 14 -

51.    Prior to the fire, David's Floor Service, Inc. understood that the crew would be using Harco lacquer sealer at the property.

**RESPONSE:**

52.    In the ordinary course of its business, David's Floor Service, Inc. would have expected its crew to utilize fans in the windows to ventilate the Stein property.

**RESPONSE:**

53.    In the ordinary course of its business, David's Floor Service, Inc. would utilize fans to circulate air and provide ventilation to prevent an accumulation of fumes, which could explode, during the application of the Harco lacquer sealer.

**RESPONSE:**

54.    In order to provide cross-ventilation at the property, David's Floor Service, Inc. understood that more than one open window was required, with the windows being on opposite walls.

**RESPONSE:**

55. Because of the risk of fire and explosion from the use of Harco sealer,

David's Floor Service, Inc. was aware that failing to follow particular precautions, including

those set forth on its Safety Manual, could result in a fire or explosion.

**RESPONSE:**

56. Prior to and at the time of the fire, building electric was not terminated on

the first floor of the property.

**RESPONSE:**

57. Prior to and at the time of the fire, building electric was not terminated on

the second floor of the property.

**RESPONSE:**

58. Prior to and at the time of the fire, electrical devices were not de-

energized/unplugged on the first floor of the property.

**RESPONSE:**

59.    Prior to and at the time of the fire, electrical devices were not de-energized/unplugged on the second floor of the property.

**RESPONSE:**


60.    Prior to and at the time of the fire, the third floor kitchen area included a Kenmore gas range.

**RESPONSE:**


61.    At the time of the fire, the gas valve for the range was in the "on" position.

**RESPONSE:**


62.    Prior to and at the time of the fire, the third floor contained a refrigerator.

**RESPONSE:**


63.    At the time of the fire, the refrigerator was plugged in to an electrical outlet.

**RESPONSE:**

- 17 -

Plaintiff Vermont Mutual Insurance Company
a/s/o Timothy D. Stein and Wayne Rolf,
By Its Attorneys,


JAMES P. CULLEN, JR., ESQUIRE
COZEN O'CONNOR
1900 Market Street
The Atrium - Third Floor
Philadelphia, PA  19103
(215) 665-4102

CO-COUNSEL:
PATRICK J. LOFTUS, III, ESQUIRE
BBO #303310
No. 9 Park Street
Suite 500
Boston, MA  02108
(617) 723-7770

## CERTIFICATE OF SERVICE

I, James P. Cullen, hereby certify that I served a true and correct copy of the foregoing

Request for Admission directed to Defendants David Floor Service and Min Dang was sent this
8TH day of May, 2006, by ~~mail~~ FEDERAL EXPUSS, postage prepaid, to the following parties:

Susan Johnson Bowen, Esquire
Warren, Hensley & Bowen LLP
185 Devonshire Street
Suite 1000
Boston, MA  02110

Timothy M. Roche, Esquire
Monahan & Associates, P.C.
113 Union Wharf East
Boston, MA  02109


_____
James P. Cullen, Jr., Esquire

PHILADELPHIA\2483152\1 155951.000

1





2









3

**David's Floor Service Inc.**
**Fire and Health Safety Provisions**

- Open windows
- Turn of gas valve behind stove/oven and water heater in on the same location.
- War respirators to prevent breathing dust and chemicals
- Do not use any electrical machine during the time put the sealer on the floors
- Examine and clear fire escape routes before beginning a job
- No smoking
- <u>Notice:</u> Harco Lacquer Sealer has a flashpoint of 29 degrees F (very flammable). It can catch fire from a source as far away as 50 feet. Overexposure has been associated with permanent brain and nervous system damage

Vietnamese:
- Mở tất cả các cửa sổ cho không khí thoát.
- Tắt ống dẫn gas dẫn vào bếp và lò nướng cũng như dẫn vào máy sưởi ấm, nếu cũng một chỗ (ống dẫn Gas ở đằng sau bếp và lò nướng)
- Đeo mạt nạ để tránh bụi và chất độc
- Không dùng bất cứ máy móc nào trong thời gian bôi sealer trên floors. (vì máy điện làm xẹt lửa dễ bắt cháy sealer và poly)
- Giám sát cửa thoát hiểm để khi hữu sự cháy còn chạy thoát trước khi bắt đầu công việc.
- Cấm hút thuốc (tàn thuốc lá dễ bắt cháy vào sealer và poly tạo nên cháy nhà).
- <u>Lưu Ý:</u> Harco Lacquer Sealer dễ bắt cháy, ngay cả khi nhiệt độ lạnh dưới 29 độ F cũng dễ bắt cháy như thường, ngay khi cách xa khoảng 50 feet cũng có thể bắt cháy, và hít vào sẽ hại cho sức khỏe và não bộ, cho nên nhớ mạc mặt nạ khi bôi sealer.



EXHIBIT

4

MSDS - Satin & Semi-gloss Polyurethane Finish

# MATERIAL SAFETY DATA SHEET

DATE OF ISSUE: 6/03
MANUFACTURER'S NAME: HARCO CHEMICAL COATINGS, INC.
208 DUPONT STREET
BROOKLYN, NY 11222

EMERGENCY TELEPHONE NO: 800-424-9300 (CHEMTREC)

INFORMATION TELEPHONE NO: 718-389-3777

## Section 1 - PRODUCT IDENTIFICATION

|  |  |
|---|---|
| MANUFACTURER'S CODE IDENTIFICATION: 5401, 5402<br>902/903, 8601, 8602<br>PRODUCT CLASS: SOLVENT THINNED PAINT | **HMIS CODE**<br>Health: 2<br>Flammability: 2<br>Reactivity: 0<br>Personal Prot.: |
| | **SARA TITLE 312**<br>Acute: YES<br>Chronic: YES<br>Fire: YES<br>Pressure: NO<br>React: NO |

## SECTION II - HAZARDOUS INGREDIENTS

| INGREDIENT | MAX PCT | CAS NO.<br>TLV | PEL | STEL | CEIL | MM Hg TEMP |
|---|---|---|---|---|---|---|
| Stoddard Solvent | 49.4 | 8052413<br>100 ppm | 100ppm | N/E | N/E | 2.0 @ 20 |
| Silica, Amorphous | 4.9 | 7631869<br>10MG/M3 | 6mg/m3 | | N/E | N/E   N/A |
| Bentonite Clay | 1.2 | 121888662<br>0.1mg/m3 | N/E | N/E | N/E | N/A |
| Ethyl Benzene | 0.1 | 100414<br>100ppm | 100ppm | 125ppm | N/E | 10.0 @ 20 |
| Methyl Ethyl Ketoxime | 0.1 | 96297<br>0.1ppm | N/E | | N/E | N/E   2.0 @ 68 |

## SECTION III - PHYSICAL DATA

BOILING RANGE    313-388 F     VAPOR DENSITY: HEAVIER THAN AIR
EVAPORATION RATE:  SLOWER THAN ETHER
PERCENT VOLATILE BY VOLUME:  60.0    WEIGHT PER GALLON:    7.6

## SECTION IV - FIRE AND EXPLOSION HAZARD DATA

FLASH POINT: 100 F
LEL:    1.0
D.O.T. FLAMMABILITY CLASSIFICATION:  COMBUSTIBLE LIQUID

EXTINGUISHING MEDIA: FOAM, CO2, DRY CHEMICAL, WATER FOG

UNUSUAL FIRE AND EXPLOSION HAZARDS - Closed containers may burst if exposed to extreme heat or fire.
Toxic gases may form when pr...... urns.
SPECIAL FIREFIGHTING PROC.   ... The use of self-contained breathing apparatus is recommended for fire fighting   ...may be unsuitable as an extinguishing medium, but helpful in keeping adjacent containers ...  Water id spreading burning liquid with water for cooling purposes. Fight as volatile liquid fire. Closed containers may explode when exposed to extreme heat.



## SECTION V - HEALTH HAZARD DATA

**EFFECTS OF OVEREXPOSURE: ACUTE**
Inhalation - Irritation of the nose throat and eyes, dizziness, weakness, fatigue, nausea, headache, possibly narcosis and asphyxiation. Symptoms disappear when exposure ceases.
Eye or skin contact may cause discomfort by defatting action.
Skin Absorption - Hazardous ingredients in this product have the capacity to be absorbed through the skin in sufficient quantities and cause systemic toxicity.
Ingestion - Irritation of the digestive tract and nervous system depression (drowsiness, dizziness, loss of coordination and fatigue). Aspiration Hazard - This material can enter lungs during swallowing or vomiting and cause lung inflammation and damage.
**EFFECTS OF OVEREXPOSURE - CHRONIC:** Prolonged or repeated contact with skin may cause dermatitis.
PRIMARY ROUTE(S) OF ENTRY - INHALATION, INGESTION, DERMAL

**EMERGENCY AND FIRST AID PROCEDURES-IF THIS PRODUCT COMES IN CONTACT WITH EYES, FLUSH WITH LARGE AMOUNTS OF WATER FOR AT LEAST 15 MINUTES AND SEEK IMMEDIATE MEDICAL ATTENTION. IN CASE OF SKIN CONTACT, WASH WITH SOAP AND LARGE QUANTITIES OF WATER AND REMOVE SATURATED CLOTHING. IF BREATHING DIFFICULTIES, DIZZINESS OF LIGHT HEADEDNESS OCCUR WHEN WORKING IN AREAS WITH HIGH VAPOR CONCENTRATION, VICTIM SHOULD BE REMOVED TO AIR THAT IS FREE FROM VAPORS. IF VICTIM CONTINUES TO EXPERIENCE BREATHING DIFFICULTIES, OXYGEN SHOULD BE ADMINISTERED UNTIL MEDICAL ASSISTANCE CAN BE RENDERED. IF BREATHING STOPS, BEGIN ARTIFICIAL RESPIRATION AND SEEK IMMEDIATE MEDICAL ATTENTION. IF PRODUCT IS SWALLOWED, DO NOT INDUCE VOMITING. DRINK WATER TO DILUTE. SEEK IMMEDIATE MEDICAL ADVICE AND/OR ATTENTION.**

OTHER HEALTH EFFECTS: Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal. Overexposure to mineral spirits has been found to cause anemia and kidney damage.

## SECTION VI - REACTIVITY DATA

**STABILITY: STABLE          HAZARDOUS POLYMERIZATION WILL NOT OCCUR**
CONDITION TO AVOID- HIGH TEMPERATURES AND BUILDUP OF VAPORS.
HAZARDOUS DECOMPOSITION PRODUCTS - Thermal decomposition may yield CO, CO2, HCN,NH3

## SECTION VII - SPILL OR LEAK PROCEDURES

**STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED** - Remove all sources of ignition. Avoid breathing vapors. Use non-sparking tools to return materials to container. Absorb residue with Fuller's earth.

**WASTE DISPOSAL METHOD** - Dispose of in accordance with local, state and federal regulations.

## SECTION VIII - SPECIAL PROTECTION INFORMATION

**RESPIRATORY PROTECTION** -Follow OSHA regulation 29cfr 1910.134 for respirator use. Use air-purifying respirator that respirator supplier has demonstrated to be effective for solvent vapors, when concentration exceed the TLV up to the maximum level at which the respirator is effective. If the concentration of solvents is not known or exceeds the level at which the air-purifying respirator is effective, a positive air supplied respirator tc19c niosh/msha is recommended.
**VENTILATION:** Designed and maintained to provide volume and pattern to prevent vapor concentration in excess of TLV or LEL.

2

PROTECTIVE GLOVES - RUBBER OR NEOPRENE COATED
EYE PROTECTION - FACE SHIELD OR SAFETY GOGGLES
OTHER PROTECTIVE EQUIPMENT - EYE BATH AND SAFETY SHOWER

## SECTION IX - SPECIAL PRECAUTIONS

PRECAUTIONS TO BE TAKEN IN HANDLING AND STORING - Combustible - Keep away from heat and flame. Avoid prolonged or repeated contact with skin, eyes and clothing. Use only with adequate ventilation.
Close container after each use.  Keep out of reach of children.  Do not take internally.

## SECTION X - SUPPLEMENTAL INFORMATION

SARA STATUS:

This material does not contain any substance which is subject to the reporting requirements of 40 CFR 372. This material has been categorized as having the following hazard(s) as defined by SARA Title III regulations (40 CFR 370):  acute, chronic, fire.☐

## Section 1 - PRODUCT IDENTIFICATION

MANUFACTURER'S NAME:
HARCO CHEMICAL COATINGS, INC.
208 DUPONT STREET
BROOKLYN, NY 11222
EMERGENCY TELEPHONE NO: 718-389-3777
*HEALTH:2*
*FLAMMABILITY:3*
*INFORMATION*
*REACTIVITY:0*
TELEPHONE NO: 718-389-3777
MANUFACTURER'S CODE 1047 VOC, 7700
PRODUCT CLASS: LACQUER SANDING SEALER

## SECTION II - HAZARDOUS INGREDIENTS

| INGREDIENTS | % | AIR CONTAMINANT LEVELS |
|---|---|---|
| SOLVENT NAPTHA | 13 | twa 400 ppm ACGIH |
| CAS 64742-89-8 | | |
| TOLUENE | 22 | pel/tlv 100 ppm |
| CAS 108-88-3 | | stel 150 ppm |
| | | twa 100ppm |
| ORTHO META & | 7 | pel/tlv 100 ppm |
| PARA XYLENE | | |
| CAS 1330-20-7 | | stel 150 ppm |
| | | twa 100 ppm |
| ISOPROPYL ALCOHOL | 11 | twa 400 ppm |
| CAS 67-63-0 | | stel 500 ppm |
| ETHYL BENZINE | 2 | tlv 100 ppm |
| CAS 100-41-4 | | stel 125 ppm |
| METHYL ETHYL | 7 | tlv 200 ppm |
| KEYTONE | | |
| CAS 78-93-3 | | stel 300 ppm |
| 2 BUTOXYEYHANOL | 5 | tlv 25 ppm (skin) |
| CAS 111-76-2 | | |
| METHYL ISOBUTYL KETONE | | |
| CAS 108-10-1 MIBK | 9 | tlv 50ppm |
| | | pel 50ppm |
| | | vap pres 15 mmhg. |
| nitrocellulose | | |
| CAS 09004700 | 11 | N/A |
| ROSIN FLAKE | 15 | N/A |
| STEARATE | 1 | N/A |

THIS MATERIAL IS SUBJECT TO REPORTING UNDER SARA TITLE III

## SECTION III - PHYSICAL DATA

BOILING RANGE 175 F - 340 F
VAPOR DENSITY (AIR=1): N/D
EVAPORATION RATE (N BUTYL ACETATE=1): < 1
PERCENT VOLATILE 73
WEIGHT PER GALLON 7.6

## SECTION IV - FIRE AND EXPLOSION HAZARD DATA

FLASH POINT: 9 F

1

FLAMMABILITY CLASSIFICATION: OSHA CLASS II DOT EXTREMELY FLAMMABLE LIQUID
EXTINGUISHING MEDIA: FOAM, CO2, DRY CHEMICAL
UNUSUAL FIRE AND EXPLOSION HAZARDS - KEEP WORK AREAS FREE OF HOT METAL SURFACES AND
OTHER SOURCES OF IGNITION.
SPECIAL FIREFIGHTING PROCEDURES– The use of self-contained breathing apparatus is recommended for
fire fighting. Water may be unsuitable as an extinguishing medium, but helpful in keeping adjacent containers
cool. Avoid spreading burning liquid with water for cooling purposes.

## SECTION V - HEALTH HAZARD DATA

Permissible exposure level: OSHA exposure limit for petroleum distillates is currently 500 pm
EFFECTS OF OVEREXPOSURE:
  SKIN: THIS MATERIAL MAY CAUSE DEFFATING AND IRRITATION AND OF SKIN PROLONGED OR
REPRATED CONTACT MAY CAUSE DERMATITIS
  INHALATION  EXCESSIVE EXPOSURE TO VAPORS OR SPRAY MISTS MAY  CAUSE
DIZZINESS,HEADACHE,INCOORIDATION,NAUSEA,  AND LOSS OF CONSCIOUSNESS. SOME REPORTS
HAVE ASSOCIATED REPEATED AND PROLONGED OCCUPATIONAL  OVEREXPOSURE TO SOLVENTS
WITH PERMANENT brain and nervous system damage.
  EYES    THIS MATERIAL MAY BE AN EYE IRRITANT.
INGESTION: MAY CAUSE CENTRAL NERVOUS SYSTEM DEPRESSION,RED BLOOD CELL
HEMOLYSIS,LIVER AND KIDNEY INJURY. VOMITTING AFTER SWALLOWING RESULTING IN ASPIRATION
OF VOMITUS INTO LUNGS WHICH MAY RESULT IN CHEMICAL PNEUMONITIS AND PULMONARY EDEMA
ASPIRATION PNEUMONITIS MAY BE EVIDENCED COUGHING, LABORED BREATHING & CYANOSIS (bluish
skin)

PRIMARY ROUTE(S) OF ENTRY -INHALATION ,SKIN CONTACT.
EMERGENCY AND FIRST AID PROCEDURES--IF THIS PRODUCT COMES IN CONTACT WITH EYES, FLUSH
WITH LARGE AMOUNTS OF WATER FOR AT LEAST 15 MINUTES AND SEEK IMMEDIATE MEDICAL
ATTENTION.  IN CASE OF SKIN CONTACT, WASH WITH SOAP AND LARGE QUANTITIES OF WATER AND
REMOVE SATURATED CLOTHING.  IF BREATHING DIFFICULTIES, DIZZINESS OF LIGHT HEADEDNESS
OCCUR WHEN WORKING IN AREAS WITH HIGH VAPOR CONCENTRATION, VICTIM SHOULD BE
REMOVED TO AIR THAT IS FREE FROM VAPORS.  IF VICTIM CONTINUES TO EXPERIENCE BREATHING
DIFFICULTIES, OXYGEN SHOULD BE ADMINISTERED UNTIL MEDICAL ASSISTANCE CAN BE RENDERED.
IF BREATHING STOPS, BEGIN ARTIFICIAL RESPIRATION AND SEEK IMMEDIATE MEDICAL ATTENTION.  IF
PRODUCT IS SWALLOWED, DO NOT INDUCE VOMITING.  SEEK IMMEDIATE MEDICAL ADVICE AND/OR
ATTENTION.
CARCINOGENICITY: THIS PRODUCT DOES NOT CONTAIN MORE THAN. 1%
OF ANY SUBSTANCE THAT LISTED AS A CARCINOGEN BY OSHA
FLUSH EYES FOR 15 MINUTES AND GET MEDICAL CARE:  IF INGESTED,
DO NOT INDUCE VOMITING AND CALL A PHYSICIAN AT ONCE

## SECTION VI - REACTIVITY DATA

STABILITY: STABLE
CONDITION TO AVOID- HIGH TEMPERATURES AND CONTACT WITH mineral acids.
INCOMPATABILITY - STRONG OXIDIZERS, ACID MINERALS
HAZARDOUS DECOMPOSITION PRODUCTS - THERMAL DECOMPOSITION MAY YIELD CO, CO2, HCN, NH3

HAZARDOUS POLYMERIZATION WILL NOT OCCUR

## SECTION VII - SPILL OR LEAK PROCEDURES

STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED -
   FLUSH WITH WATER INTO RETAINING AREA OR CONTAINERS.
   AVOID EXPOSURE TO SPARKS, FIRE OR HOT METAL SURFACES.
WASTE DISPOSAL METHOD - DISPOSE OF IN ACCORDANCE WITH LOCAL, STATE AND FEDERAL
REGULATIONS.

2

SECTION VIII - SPECIAL PROTECTION INFORMATION

RESPIRATORY PROTECTION  A CANISTER TYPE RESPIRATOR MUST BE WORN
VENTILATION - LOCAL EXHAUST-PREFERRED:  MECHANICAL exhaust acceptable.
PROTECTIVE GLOVES - RUBBER OR NEOPRENE
EYE PROTECTION - FACE SHIELD OR SAFETY GOGGLES
OTHER PROTECTIVE EQUIPMENT - EYE BATH AND SAFETY SHOWER

SECTION IX - SPECIAL PRECAUTIONS

PRECAUTIONS TO BE TAKEN IN HANDLING AND STORING - AVOID PROLONGED OR REPEATED
CONTACT WITH SKIN, EYES AND CLOTHING.  KEEP FROM FREEZING.
OTHER PRECAUTIONS - FOR INDUSTRIAL USE ONLY
PRECAUTIONS TO BE TAKEN IN HANDLING AND STORING:
    Avoid prolonged or repeated inhalation of heated vapors or spray mists.  Keep away from heat or open flame.
Avoid prolonged or repeated skin contact.

OTHER PRECAUTIONS:
    None known.

SECTION X - SUPPLEMENTAL INFORMATION

SARA STATUS: REPORTABLE UNDER SARA TITLE III FOR VMP
    This material does not contain any substance which is subject to the reporting requirements of 40 CFR 372.
    This material has been categorized as having the following hazard(s) as defined by SARA Title III regulations
(40 CFR 370): acute, chronic, fire.
DOT PROPER SHIPPING NAME: EXTREMELY FLAMMABLE LIQUID
UN NUMBER:  1263

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 05 10307 JLT

VERMONT MUTUAL INSURANCE COMPANY    )
as subrogee of TIMOTHY D. STEIN and )
WAYNE ROLF                          )
        Plaintiff,                  )
                                    )
                                    )
       v.                          )
                                    )
DAVID'S FLOOR SERVICE, INC.         )
                                    )
                                    )
       and                         )
                                    )
MIN DANG, d/b/a                     )
DAVID'S FLOOR SERVICE,              )
       Defendants                  )
     Third-Party Plaintiffs       )
                                    )
       v.                          )
                                    )
MUOI BUI a/k/a MUOI PHAM,           )
AS ADMINISTRATRIX OF                )
THE ESTATE OF TOAN BUI              )
d/b/a/ BLESS HARDWOODS              )
     Third-Party Defendants       )
_____ )

RESPONSE OF DAVID'S FLOOR SERVICE INC. AND MINH DANG
TO PLAINTIFF'S REQUEST FOR ADMISSIONS

**General Objection**: The defendants, David's Floor Service

Inc. and Minh Dang d/b/a David's Floor Service object to

each and every request for admissions served by the

plaintiff on May 8, 2006 as they are in violation of the

orders by Judge Tauro dated March 13, 2006 and April 11,

2006.  The orders specifically limit discovery and note

that no further discovery may be taken without leave of

court.  Copies of the orders are attached.

Defendants/Third-Party Plaintiffs,
By their attorney,


Susan Johnson Bowen
BBO#561543
Warren, Hensley & Bowen LLP
185 Devonshire Street, Suite 1000
Boston, MA 02110
(617) 542-4130


**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing document on the parties to this case by mailing a copy hereof, postage prepaid, to Patrick J. Loftus, Esq., LAW OFFICE OF PATRICK J. LOFTUS, No. 9 Park Street, Suite 500, Boston, MA 02108 and James, P Cullen, Jr., Esq., COZEN O'CONNOR, 1900 Market Street, The Atrium-Third Floor, Philadelphia, PA 19103 and to Timothy M. Roche, Esq., Monahan & Associates, Esq., 113 Union Wharf East, Boston, MA 02109 on May 9, 2006.


Susan Johnson Bowen

-2-

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| VERMONT MUTUAL INSURANCE COMPANY as subrogee of TIMOTHY D. STEIN and WAYNE ROLF, | * * * * | |
| Plaintiff, | * * | Civil Action No. 05-10307-JLT |
| v. | * * | |
| DAVID'S FLOOR SERVICE, INC. and MIN DANG, d/b/a DAVID'S FLOOR SERVICE, and MUOI BUI, a.k.a MUOI PHAM, as ADMINISTRATRIX of the ESTATE OF TOAN BUI, d/b/a BLESS HARDWOODS, | * * * * * * * | |
| Defendants. | * * | |
| MIN DANG, d/b/a DAVID'S FLOOR SERVICE., | * * * | |
| Third Party Plaintiff, | * * | |
| v. | * * | |
| MUOI BUI, a.k.a MUOI PHAM, as ADMINISTRATRIX of the ESTATE OF TOAN BUI, d/b/a BLESS HARDWOODS., | * * * * | |
| Third Party Defendant. | * * | |

ORDER

April 11, 2006

TAURO, J.

After the Scheduling Conference held on April 11, 2006, this court hereby orders that:

1.  Plaintiff may depose the following: (1) David Dang; and (2) Minh Dang;

2.  Third Party Defendant may depose the following: (1) Trung Le; and (2) the other

worker involved in performing the work at issue;

3.    All discovery must be completed by July 31, 2006;

4.    No additional discovery will be permitted without leave of this court; and

5.    Trial will begin on August 28, 2006 at 10:00 a.m.

IT IS SO ORDERED.

   /s/ Joseph L. Tauro    
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VERMONT MUTUAL, et al

V
DAVID'S FLOOR, et al

CIVIL ACTION No. 05-10307 -JLT

DISCOVERY ORDER

TAURO,.J.:

On or before, 03/30/06 the parties shall have exchanged and reviewed (1) all documents in accordance with Local Rule 26.2(A), and (2) sworn statements in accordance with Local Rule 26.1(B), and (3) a list of persons they wish to depose.

A list of the proposed deponents shall be presented to the Court at the scheduling conference.

In addition, the parties shall, without awaiting a discovery request, provide to other parties:

(A) the name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings, identifying the subjects of the information and

(B) a copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the party that are relevant to disputed facts alleged with particularity in the pleadings.

No additional discovery shall take place without further order of the court.

Counsel shall notify the court in writing, no less than (5) days prior to the scheduled conference, of pending motions. Any motion not brought to the court's attention (5) days prior to the scheduled conference will be deemed denied as moot.

The court does not accept any letters requesting decision or action. Any such request must be in the form of a motion. Letters submitted for information purposes only must be addressed to Zita Lovett, Deputy Clerk.

IT IS SO ORDERED.
03/14/2006

By the Court,
/s/   Zita Lovett,
DEPUTY CLERK

Sched Conf  4/11
- 11:15
Crm 20

**Clark, Valerie L.**

| | |
|---|---|
| **From:** | Cullen,Jr., James |
| **Sent:** | Monday, May 15, 2006 11:02 AM |
| **To:** | Clark, Valerie L. |
| **Subject:** | FW: Stein |

| | |
|---|---|
| **From:** | Cullen,Jr., James |
| **Sent:** | Friday, May 12, 2006 2:00 PM |
| **To:** | Sue Bowen |
| **Subject:** | Stein |

Sue -- please allow this to confirm that we have reached an impasse re: plaintiff's request for admission and that defendant david's floor will not answer these, absent a court order -- we will file for leave to compel a response.

If this is not accurate and you are willing to answer without motion practice, please do not hesitate to correct me.

Regards

Jim

 

# Massachusetts State Police

# Report of Investigation

| Case Number 2004-117-0979 | | Controlling Case Number | |
|---|---|---|---|
| Author | | Created On 09/02/2004 | |
| Lead Investigator | Peter C Cummings | Assisted by Robert L Bachelder | |
| Team | North | | |
| Agency Assist | | K-9    No | |

| Date of Incident   09/02/2004 | | Time of Incident 12:52 PM (approximate) | |
|---|---|---|---|
| Requested By: | | Requested On: | |
| Organization | Somerville Fire Department | Date  09/02/2004 | |
| Representative | Chief Kelliher | Time  13:15 PM | |
| Email Address | | | |

| Case Type (codes) | F30 Fire - Accidental |
|---|---|
| Warrant | None |
| Property Type | Residential |

| Technical Assistance   None |
|---|
| |
| |
| |
| Other |

| Street Address | 4 Foskett St. |
|---|---|
| City / Town | Somerville |
| State | MA |
| Zip Code | |

| Case Status | C7 Closed Completed |
|---|---|
| Approved By | Kevin J McMahon |
| Approved On | 05/27/05 11:51 |
| Comments | Three alarm fire to 3 1/2 story, wood shingled and sided, three family residential dwelling. Fire involves fatal injuries to one, as of yet, unidentified male. Three other injured persons transported to Mass. General Hospital: one with life threatening fire injuries. All four injured were part of floor refinishing crew, working in building since approximately 8:45 AM. Area of origin/most severe burn damage, located on stairwell between second and third floors. Workers in process of applying extremely flammable sanding sealer to floor. |



EXHIBIT
1
Cummings
10-19-05

| Massachusetts State Police | | Report of Investigation | |
|---|---|---|---|
| 1. Station<br><br>Office of The State Fire Marshal (SFMO) | | 2. Case Number<br><br>2004-117-0979 | |
| 3. Project | 4. Controlling Case No.<br><br>2004-117-0979 | 5. Report No. | Page 1 of 16 |
| 7. Reporting Officer<br>(Rank, First, MI, Last & ID#)<br><br>Tpr. Peter C. Cummings, #0848 | 7a. Signature<br><br>Tpr. Peter C. Cummings | | 7b. Date Prepared<br><br>05-25-05 |
| 8. Approved by:<br>(Rank, First, MI, Last & ID#)<br><br>Lt Kevin McMahon #0416 | 8a. Signature | | 8b. Date Prepared |

9: Subject-

See attached report for fire at 4 Foskett Street, Somerville, MA:

ARRESTS    None

This report is the Property of the Massachusetts State Police.
No part of this report may be disseminated outside the agency to which provided.

Fire Investigation Summary Report

Case Number: **2004-117-0979**
Controlling Case Number: **None**
Case Type: **F30 Fire - Accidental**

Report Creator: **Peter C Cummings**
Lead Investigator(s): **Peter C Cummings**    Team: **North**

FIU Requested By: **Chief Kelliher from Somerville Fire Department**
FIU Requested On:

Date and Time of **09/02/2004 at approximately 12:52 PM**
Incident:
Address/ Location of **4 Foskett St.  Somerville,  MA**
Incident:

## Property Investigated

Type of Investigation: **Fire**
Type of Property: **Residential**

**Protection Systems:**
Smoke Detector: **Operational**
Heat Detector: **Not Operational**
Sprinkler: **Not Operational**
Comments: **Subject property is a two and one-half story, wood shingled and clapboard sided structure with a slate roof.  The building contains a full basement and has three apartments.  The first floor and part of the second floor is occupied by the owners of the property.  The remaining portion of the second floor is a second apartment and whose occupant was at work and away from the scene on the incident date. An apartment exists on the top floor (formerly an attic area), was vacant and was in the process of being rehabilitated.  Dormers existed on this top floor, on the "B" and "D" sides of the building.  Exterior porches exist at the front of the building on the second and first floors.  Rear porches/decks and stairs are present at the rear of the building, towards the "C/B" corner.  This property is situated on the southeast corner of Foskett and Willow Streets in Somerville.**

## Fire Source

Cause of Fire: **Accidental**
Ignition: **Several possible first ignition sources existed (3rd floor gas stove pilot, 3rd floor refrigerator compressor, 3rd floor heat and a/c unit, electrical switches) and cannot be further isolated.**
Material Ignited: **Vapors from "Harco #850, Quick Dry Polyurethane Primer/Sanding Sealer".**
Explanation:

### NOTIFICATION, RESPONSE AND OVERVIEW:

1.    At approximately 12:52 PM, the Somerville Fire Department received several reports of fire conditions at 4 Foskett Street, Somerville, MA and fire apparatus was dispatched to this address, commanded by Chief Kelliher.  Contemporaneously, an off-duty firefighter (witness Kerner) had

been situated on a street behind Foskett Street, and at this time, smelled smoke, heard smoke detectors sounding and heard Asian males screaming. Kerner ran to the front of Foskett Street and found two Asian males standing on the sidewalk. A third Asian male was naked and sitting on the sidewalk. As Kerner ran to 4 Foskett Street, he saw smoke pouring from the third floor of this building. (See interview of Kerner, below). According to Chief Kelliher, the first arriving firefighters made entry into the home through the first floor, front door and found heavy smoke and fire conditions in the first floor stairwell, and from the second floor stairwell to the third floor of this home. While suppressing the fire conditions in the first floor stairwell, firefighters discovered human remains.

2.    I was notified to respond to this address at about 13:15 hours and I arrived at about 2:00 PM. Upon my arrival I met with Chief Kelliher and numerous Somerville Fire and Police Investigators. I learned at this time that immediately prior to the fire, four Vietnamese men had been working within the building, sanding and refinishing the hardwood floors on the third floor and in the interior stairwell leading from the second floor to the third floor. At the present time, the three surviving fire victims had been transported to the Mass. General Hospital and I was told that one of these men was in very serious and critical condition. A second survivor was listed in very serious condition and the third man was conscious and suffered the least amount of injuries. (Information later obtained by one of the Somerville Police Detectives from admission records at Mass. General Hospital revealed that the more severely injured of the three remaining victims was Ha Vu; the least injured Vietnamese male was Le Trung and the third man admitted was Nam Dao. I was also informed that the deceased, in all probability, was Toan Bui and I obtained possible pertinent information).

3. I was soon joined at 4 Foskett Street, Somerville, MA by Sergeant Robert Bachelder (Mass. State Police Fire and Explosion Investigation Unit) and due to the known fatality, requested the presence of and later received the assistance of the State Police Crime Scene Services Section (Sergeant Steven Bennett) and Trooper Alan Hunte (from the Middlesex District Attorney's Office). The Medical Examiner's Office was notified of the fatality and indicated a representative from their office would be forthcoming. (The body located in the first floor stairwell was later

removed from 4 Foskett Street by employees of Premier Heritage Services, Inc., at the request of the Medical Examiners Office, and transported to the Medical Examiners Offices in Boston for identification and autopsy).   (NOTE: This investigation was conducted jointly with Somerville Fire and Police Department Investigation Units, the Mass. State Police Crime Scene Services Section and with Trooper Alan Hunte [of the Middlesex County District Attorney's Office]. Unless otherwise mentioned, one of these representatives was present during all observations, documentation of evidence, photographing of the scene, all interviews, etc.  This report therefore, represents a collection of these observations, information and opinions).

## **FIRE SCENE EXAMINATION:**

4.  4 Foskett Street, Somerville, MA is more particularly described as a two and one-half story dwelling containing three apartments.  It is a free-standing, wooden structure with wood shingles and clapboards and a slate roof.  The top floor (used as a third floor apartment and vacant at the time of the incident), had dormers on the "B" and "D" sides of the home.  The first floor and half of the second floor of this home is occupied by the owners of the property and who were on scene at the time of the incident.  The remaining portion of the second floor is apartment #2 and whose occupant was at work and away from the address when the fire occurred.  Exterior front porches exist on the "A" side of the building on the first and second floors.  Exterior rear decks stairs are present on the "C" side of the house and are towards the "B/C" corner of the building.  An interior, rear staircase leads from the basement to the first, second and third levels of this home. A doorway from this interior stairwell leads out to the rear, first floor deck where another set of exterior stairs lead to ground level.  The main/front entrance to this home is located on the "A" side of the house towards the "A/D" corner.

5.    When entering the property through the front entrance of 4 Foskett Street, Somerville, MA a stairway is present along the "D" side of the building leading to the second floor.  At the top of these stairs a hallway exists leading to the second floor apartments and an interior staircase, approximately in the center of the second floor, leads to the third floor apartment.  (NOTE: Photographs of the home were taken by Sergeant Steven Bennett of the State Police Crime Scene

**Fire Investigation Summary Report**

Service's Section to include specific areas inside and outside of the home during the course of our fire scene examination).

6.    The exterior examination of this property revealed the greatest amount of damage was visible to the third floor. Specifically, dormers on the "B" and "D" side of the third floor were heavily damaged. (The roof still existed towards the front of the house (or towards the "A/B" and "A/D" corners and "A" side of the home. The roof was completely destroyed towards the rear of the house, near the "B/C" corner and "C" side of the home. (Note: We later learned that this area of the third floor was the kitchen area). Our interior examination of the fire scene revealed the greatest amount of fire damage to this home was located from the interior, second floor stairwell up to and including the third floor. It should be noted that heavy fire damage was also observed in the stairwell leading from the first floor to the second floor and in and around the location where the body was found. This damage was more significant at the lower stairs of this staircase, near the first floor landing and became much less significant as one climbed the stairs to the second floor. Our observations revealed that the interior staircase leading from the second floor to the third floor were gone. Although fire damage existed at the bottom of these stairs, at the second floor landing, much greater and significant damage was noted on the third floor, at the top of these stairs.

7. Further observation of the second floor hallway, leading from the stairwells towards the rear of the house, revealed that the fire damage was less significant the further you went away from these stairs. Specifically, in this hallway, towards the rear of the house after having passed the bathroom, no damage was found on wall studs. At the bottom of the 2nd/3rd floor interior stairs, at the second floor landing, we observed a five gallon metal bucket. (This bucket was empty and no identifying markings were obvious). As stated, this set of stairs was completely consumed but the greatest fire damage was present on the wall studs towards the top of the stairs, versus the wall studs at the bottom of the stairs. The fire damage caused to the third floor apartment was most significant to the rear "half" of the house, as opposed to the front "half" of the house. Significant fire and heat damage was present on both sides of the interior third floor staircase and towards the rear of the house, where the third floor kitchen was located. We observed the third floor

### Fire Investigation Summary Report

refrigerator was present in a pantry space, off the kitchen, and which backed up to the top of the interior stairs. A gas stove was present in the kitchen and was situated on the "B" wall of the kitchen, towards the "B/C" corner of the building. Further, a gas fired furnace/heating unit, used to heat the third floor apartment, was present above the third floor ceiling and was positioned almost in the middle of the third floor, almost directly above the interior staircase leading from the second floor to the third floor. No damage or minimal damage associated with fire spread was found in other first floor areas or second floor areas not otherwise mentioned.

8. The body of the male was found on the stairs, near the first floor landing and lying face down. No clothes were present on the body. The body had suffered considerable fire, heat and possibly explosive damage and had been very consumed by the fire and heat. We determined that physical identification via observation would not be possible. Further, I noticed that fire damage within this stairwell was greatest around the area of the body. I also observed approximately halfway up these stairs, where the stairs make a ninety degree turn, additional fire damage was present and a "V" pattern was visible on the exterior "D" wall of the stairwell, but only extended downward as low as the stairs. Based upon my observations of the body, its condition and the fire patterns present within this stairwell, I formed the opinion that the fire conditions present in this stairwell leading from the first floor to the second floor occurred via the transference of heat and flame from the deceased's body and other fire victim's bodies to the stairwell. As stated, representatives from the Medical Examiners office arrived and transported the body to the Medical Examiners Office for identification and autopsy.

9. We also examined two cargo vans which were parked on the street and in the driveway at 4 Foskett Street. These vehicles bore Mass. Registrations "J90-413" and "J90-414". (A check with the Registry of Motor Vehicles revealed that the owner of these vans was Toan BUI, 7 Vera Street, Dorchester, MA). In these vans we located the following sealing and finishing materials: two (2) five gallon containers of "Capital", Wood Floor Supply, Inc., Polyurethane- - Gloss; One (1) five gallon container of "Industrial Lacquer Sanding Sealer 6500" (and showing a distributor of Arnel Co., Inc., Danvers, MA); One (1) five gallon container of "Harco" Heavy Duty Floor Lacquer, Quick Drying, #760; and Two (2) five gallon containers of "Harco" #850, Quick Dry

Polyurethane Primer/Sanding Sealer. I also noticed that inside of these vans were one large "Super Galaxy 2000" upright sander; one "Astercraft" upright orbital sander and one "Alto American" sander (knee unit). I also noticed that the five gallon drum of Industrial Lacquer Sanding Sealer 6500 and the five gallon container of "Harco #760" bore "Flammable 3" warning labels, while the five gallon containers of "Harco #850" bore "Flammable 2" warning labels. (It should also be noted that in our examination of the interior of 4 Foskett Street, Somerville, MA we did not locate any sanding equipment within the property).

## WITNESS/OCCUPANT INFORMATION/OBSERVATIONS AND STATEMENTS:

### INTERVIEW OF WAYNE R., FETTE, 4 FOSKETT STREET, SOMERVILLE, MA:

10. As mentioned, we spoke with owners and occupants of the property and other witnesses. Mr. Fette informed us that he and his partner, Timothy Stein had contracted with David's Floor Service (of 33 Osgood Street, Somerville, MA; owned and operated by David Dang) and made arrangements for the third floor hardwood floors to be refinished as the apartment at present was vacant. This contract further called for the refinishing of the stairs leading from the second floor to the third floor and also for the refinishing of the stairway leading from the first floor to the second floor. Mr. Fette stated that two Asian male workers arrived at his house at about 8:45 AM and these men immediately started sanding the floors. Mr. Fette believed, based upon his conversations with David Dang, that the workers and/or their supervisor would ensure all necessary safety precautions would be taken (i.e., opening windows, turning off ignition sources, etc). Mr. Fette said that he was painting the rear stairwell in the morning and heard the smoke detectors sounding several times. He attributed these alerts to dust caused by the sanding.

11. Mr. Fette thought that the second van, containing two other Asian male workers arrived at the house at about 11:30 AM or 11:45 am. These two workers joined the other men on the third floor. Shortly before these two workers arrived, Mr. Fette recalled one of the Asian men on the third floor "cracked open" the rear door to the third floor apartment in the rear stairwell and believed that this door was left ajar. Mr. Fette could not add anything else remarkable until the time of the

## Fire Investigation Summary Report

incident when he heard loud thumping, banging and yelling. Mr. Fette informed us that the gas pilots to the third floor kitchen gas stove and the third floor heating unit had been on the day before the fire and again added that his belief was that the floor refinishers would turn off any necessary ignition sources prior to beginning their work.

INTERVIEW OF TIMOTHY STEIN, 4 FOSKETT STREET, SOMERVILLE, MA:


12. Mr. Stein agreed with Mr. Fette on the arrival times of the two gentlemen earlier in the morning and the two men who arrived later on. Mr. Stein stated he also had been working in the rear stairwell with his partner, painting. Minutes before the fire, Mr. Stein stated he went into the bathroom located in the first floor apartment and turned on the shower. He began to get undressed and as he stepped into the shower, he heard loud thumping and banging, which he described sounding like a "sander falling down the stairs". Almost immediately, Mr. Stein said Chad Loveland (who was working for Fette and Stein in the house) came running into the first floor apartment and bathroom and yelled to Timothy Stein that "someone was on fire" and stated he "needed a blanket". As Stein followed Loveland into the first floor hallway and stairwell, Mr. Stein thought that one man was already outside and three other workers were still inside of the house at the doorway. Mr. Stein said he called 911, quickly grabbed some clothes and left the apartment.


INTERVIEW OF CHAD R. LOVELAND, 277 MAIN STREET, OGUNQUIT, MA:


13. Mr. Loveland told us that he was friends with Stein and Fette and performed odd jobs for them on occasion. On the day of the fire, he stated he was assisting them in painting the back stairway and hallways and recalled only seeing two workers up until the time of the fire. At about that time, he remembered talking about lunch with Wayne Fette and was in the process of going downstairs through the basement to retrieve more paint, which was stored that morning on the front porch. As he descended the stairs to the basement, he recalled hearing very loud thuds and bangs and also thought that a sander had fallen down the stairs. He went from the basement into the first floor apartment and saw that Tim Stein was just getting out of the bathroom. He opened the first floor apartment door into the front stairwell and saw a man near the front door, trying to

walk outside and saw that this man was on fire in the upper body area. Mr. Loveland said he returned into the apartment and tried to find a blanket and after going back into the stairwell saw that it now was on fire. He yelled to Tim Stein that "the house was on fire" and saw flames coming down the stairwell towards the front door. Loveland said that the stairwell soon filled with smoke and he recalled that the smoke alarms had been frequently sounding in the morning. On the front porch and walkway, Loveland remembered seeing the man who was on fire sitting on the ground "Indian style" and remembered seeing another man running around. Mr. Loveland said he made no other observations of other men in the house or out on the sidewalk.

### INTERVIEW OF ELLIOT KERNER, OFF-DUTY SOMERVILLE FIREFIGHTER:

14. As stated, Elliot Kerner was on the street which ran parallel and behind 4 Foskett Street. At about 12:50 PM, he remembered smelling smoke and his attention was then drawn to 4 Foskett Street by the sounds of smoke alarms. He told me he also heard yelling and screaming and thought it "was Asian males yelling". As Kerner made his way out to the front of Foskett Street, he saw heavy smoke coming from the third floor areas, primarily on the Willow Street side of the home. At the front entrance, he saw two Asian males standing on the sidewalk, one of whom he thought had burns to his face and head. Kerner said he saw a third Asian male sitting on the front porch stairs and saw this man was naked except for approximately three inches of one sock around one of his ankles. Kerner recalled that this man suffered from severe burns across all areas of his body except for the area protected by remnants of his sock. Kerner assisted in pouring water on this man's body. Mr. Kerner said that he never saw the fourth man.

### INTERVIEW OF DAVID AND MINH DANG, 33 OSGOOD STREET, SOMERVILLE, MA:

15. We learned from the owner's of the 4 Foskett Street, that the contractor for the floor refinishing project was David's Floor Service, doing business from 33 Osgood Street, Somerville, MA ███████████████████ Information obtained from the DANG's revealed that David Dang was the President/Owner of David's Floor Service and that Minh Dang (David's son) was the chief operating officer and treasurer/secretary of the corporation. I learned that David had

been in the floor business for approximately twenty-one years while Minh joined the family business approximately three years ago. I was informed that the Dang's were the contractor for the job, having agreed to sand and refinish the hardwood on the third floor and two sets of stairs (the front stairs leading from the first floor to the second floor and the interior stairs leading from the second floor to the third floor). I was informed that the Dang's then subcontracted this work out to Toan BUI and that all personnel and equipment necessary to perform this work became the responsibility of Toan BUI. Other than entering the property for estimate purposes, neither David or Minh Dang had entered the property earlier that day. They also stated that responsibility for ensuring all possible ignition sources were off, prior to starting work, would have fallen to Toan BUI.

INTERVIEW OF NAM DAO, 15 SHEPTON STREET, #1, DORCHESTER, MA:

16. Mr. DAO was interviewed on January 13, 2005 with the assistance of a Vietnamese interpreter (Mr. Richard Landrigan). Mr. Dao told us that he worked for Toan Bui and David Dang periodically over the last several years. Typically, Dao said, David Dang gets the jobs and then subcontracts the work out to Toan Bui or other persons in the business. Toan Bui's business, Dao said, was called "Bless Hardwoods", and operating from 7 Vera Street, Dorchester, MA. Dao stated that he gets paid via check from Toan Bui and recalled receiving one check for work performed directly for David Dang some years before.

17. On Thursday, September 2, 2004, Nam Dao told us that Toan Bui drove him to 4 Foskett Street at approximately 11:30 AM or noon and joined Le Trung and Ha Vu, who were already at the address. Nam Dao said that when he arrived, Le Trung and Ha Vu had just completed sanding. According to Mr. Dao, the windows were open upon his arrival, although he stated that he did not personally open any other these windows. Mr. Dao recalled that Le Trung was vacuuming either the second floor landing or the first/second floor stairs and that Ha Vu was working at the top of the stairs near the third floor. Dao did not know where Toan Bui was located and could not recall whether or not Ha Vu was applying any sealer to the stairs. Dao stated, however, that the sealer had been applied to the third floor hardwood, but he did not know

### Fire Investigation Summary Report

if any sealer had yet to be applied to the interior stairwell. Dao remembered entering the bathroom on the second floor when suddenly, he heard Ha Vu yelling loudly. Dao immediately left the bathroom and saw huge flames at the top of the stairs, at the third floor landing and saw these stairs racing down the stairwell. Nam Dao stated he ran down the stairs and outside and saw that Le Trung was already outside. Dao said that they were soon joined outside by Ha Vu and added that he never saw Toan Bui.

18. When Dao went into the 2nd floor bathroom, he could not recall if he turned on (or off) and bathroom lights. Mr. Dao informed us that to his knowledge, all sanders and other equipment used at contracted addresses was owned by Toan Bui. Dao stated that although all four workers smoked cigarettes, they "never smoked in the buildings when working" and "did not see anyone smoking inside" on September 2, 2004. Dao stated that although dust masks were available in the vans, he did not notice any workers wearing them on September 2nd and did not wear one himself. When asked, Dao stated he did not check to see if electrical ignition sources or gas pilots were extinguished and added that "this would not be his job" and that he "never worried about electricity or gas". Dao said that he knew the materials applied to the floor were "very flammable". Dao was unable to specifically assist us in determining where the vapors first ignited and could only state that he "first saw the flames at the top of the stairs on the third floor, and the flames then continued down the stairs.

### INTERVIEW OF LE TRUNG, 77 BAYSTATE ROAD, QUINCY, MA:

19. After speaking with Nam Dao, we then spoke with Le Trung and I noticed that Mr. Trung understood and spoke English better than Dao. Mr. Trung stated that he had worked for Toan Bui for approximately two years and that on September 2, 2004, he drove to the address with Ha Vu and arrived at about 8:30 AM. Trung recalled having worked for David Dang on one prior occasion, perhaps for as long as one week at another contract. During the last two years, Trung stated he never saw David Dang or his son, Ming, on any jobs and that all instructions he received about work and all payments for work performed, came from Toan Bui. Le Trung told me that upon their arrival, he and Ha Vu immediately began to sand the stairs, leading from the first floor

**Fire Investigation Summary Report**

to the second floor, followed by sanding the stairs from the second floor to the third floor. They then began to sand all hardwood on the third floor and had just finished this process when Toan Bui and Nam Dao arrived. Le Trung stated that he did not turn off or check to make sure gas pilots were off at the third floor stove and/or heating unit above the third floor. Further, he said he did not see Ha Vu check to see if these pilots were off. (Trung added that it was usual for Toan Bui to take care of eliminating these potential ignition sources. Although Trung did not see Ha Vu turn these items off, he thought Ha Vu would have taken care of it).

20. I asked Le Trung if they opened the windows to the property on September 2, 2004 and he replied that "he thought they were open", but added he "did not recall opening any". If windows were opened that day, he could not recall which windows were opened and therefore, ultimately, did not know if windows were opened or closed when the sealer was applied. Trung stated that on occasion, he has worn dust masks or other respiratory protective devices, but did not remember wearing any on September 2. When asked if any interior lighting had been turned on (or off), Le Trung said he "did not know but they usually did not touch the lights". When asked if he unplugged the refrigerator, Le Trung stated that "he did not".

21. Immediately before the fire, Le Trung stated he was finishing vacuuming on the second floor landing and had turned the vacuum cleaner off two to three minutes before he heard screams. (Le Trung described the vacuum as a "big plastic unit" that Toan Bui had purchased. [It should be noted that no remnants of a vacuum was found among the debris). At that time, Le Trung stated that Nam Dao was in the second floor bathroom and he was uncertain where Ha Vu was situated. Toan Bui, Le Trung said, was on the third floor somewhere; exactly where he was uncertain. Trung said the sealer was still being applied on the third floor, and that whoever was applying it had yet to reach the interior stairwell. Trung said he heard loud screaming and looked up the stairwell from the second floor to the third floor and saw large amounts of flames and fire spreading from the third floor into the stairwell. Trung said the fire came "out across the third floor, into the stairwell and across the stairwell". Trung said he ran down the stairs and outside and did not see anyone else outside the house. Moments later, he saw Nam Dao come out the front door and the door closed. Hearing something behind the front door, Le Trung said he

opened the front door and saw Ha Vu standing there, on fire. Ha Vu then went outside with the other two men. Le Trung said he never saw Toan Bui. When asked, Le Trung reiterated that he heard no other sounds or noises prior to the men screaming.

## IDENTIFICATION OF TOAN BUI AND AUTOPSY RESULTS/DEATH OF HA VU:

22. As a result of information obtained during this investigation, I contacted Doctor Christos Koumoutseas, a doctor of dentistry medicine and confirmed that Toan Bui was a patient. By arrangement, a set of dental x-rays were obtained by Doctor Kate Crowley (a Dental Pathologist with the Medical Examiners Office) and by teeth comparisons, a positive identification of the deceased as Toan Bui was obtained. An autopsy of Toan Bui was later conducted by one of the pathologists at the direction of the Medical Examiner's Office, and cause of death was determined to be severe thermal injuries, coupled with severe smoke inhalation. Several days after being admitted to Mass. General Hospital, I learned that Ha Vu had succumbed to injuries received from the explosion/fire at 4 Foskett Street, Somerville , MA.

## AREA OF ORIGIN DETERMINATION:

23. As stated in the fire scene examination section above, the most significant and greatest amount of damage to this property was present on the third floor of the building, more specifically in the rear area of the apartment where the kitchen was located. The gas stove, whose pilot by all accounts remained on, was located towards the "C/B" corner of this building. The refrigerator was 'tucked away' in a small pantry, which backed up to the top of the interior stairs. However, I noted that damage to wall studs in this area did not appear as significant as in other areas of the kitchen or hallway areas. Further, as stated, a gas-fired, heating/air conditioning unit was present in the crawl space and located almost immediately above the interior stairwell. For these reasons and the reasons stated above, I believe the area of origin is within the kitchen area, near the "B/C" corner, of this address.

## CONCLUSIONS:

**Fire Investigation Summary Report**

24.  As a result of the above information and investigation into the cause of the explosion/fire occurring at 4 Foskett Street, Somerville, MA it is my opinion as well as the collective opinion of all investigators involved in this case that the cause of this fire is accidental, occurring from the accidental ignition of chemical vapors produced during the hardwood floor finishing process.  The exact cause of ignition remains undetermined, but I believe that it was most probably initiated by these vapors reaching the gas pilot on the third floor kitchen stove and ultimately, due to the failure of the workers to properly extinguish the gas pilot.  However, as stated, other sources of ignition were present to include the refrigerator's compressor and electrical lights.



Coversheet.doc

## Evidence

No Evidence

## Photos

No Photographs

## K-9

K-9 Not Used

## Fire Investigation Summary Report

## Occupants

Bui, Toan V. -- 7 Vera Street, #3.   Dorchester,  MA   00000

Vu, Ha    -- 12 Mellon Street, #2   Dorchester,  MA   00000

Nam, Dao   -- 15 Shepton St., #1   Dorchester,  MA   00000

Le, Trung    -- 77 Baystate Road   Quincy,  MA   00000

Stein, Timothy D -- 4 Foskett St., first floor   Somerville,  MA   00000

Loveland, Chad R. -- 277 Main Street (Black Bear Inn)   Ogunquit,  ME   00000

## Injuries

Bui, Toan V. -- 7 Vera Street, #3.   Dorchester,  MA   00000

Vu, Ha    -- 12 Mellon Street, #2   Dorchester,  MA   00000

Nam, Dao   -- 15 Shepton St., #1   Dorchester,  MA   00000

Le, Trung    -- 77 Baystate Road   Quincy,  MA   00000

## Owner

Stein, Timothy D -- 4 Foskett St., first floor   Somerville,  MA   00000

Fette, Wayne R. -- 4 Foskett St., First floor (also address: 123 Ogunquit Rd., Cape Neddick, MA)
Somerville,  MA   00000

Quorollo, Barbara   -- 4 Foskett St., 2nd Floor (Rents apartment on 2nd floor, only)   Somerville,
MA   00000

## Fire Investigation Summary Report

### Reported By

Kerner, Elliot  -- Off duty Somerville Firefighter   Somerville,  MA   00000

### Discovered By

Bui, Toan V. -- 7 Vera Street, #3.  Dorchester,  MA   00000

Vu, Ha   -- 12 Mellon Street, #2  Dorchester,  MA   00000

Nam, Dao   -- 15 Shepton St., #1  Dorchester,  MA   00000

Le, Trung   -- 77 Baystate Road   Quincy, MA   00000

Loveland, Chad R. -- 277 Main Street (Black Bear Inn)   Ogunquit,  ME   00000

### Witnesses

Nam, Dao   -- 15 Shepton St., #1   Dorchester,  MA   00000

Le, Trung   -- 77 Baystate Road   Quincy, MA   00000

Stein, Timothy D -- 4 Foskett St., first floor   Somerville,  MA   00000

Loveland, Chad R. -- 277 Main Street (Black Bear Inn)   Ogunquit,  ME   00000

Fette, Wayne R. -- 4 Foskett St., First floor (also address: 123 Ogunquit Rd., Cape Neddick, MA)
Somerville,  MA   00000

Kerner, Elliot   -- Off duty Somerville Firefighter   Somerville,  MA   00000

# NEFCO

*New England Fire Cause & Origin, Inc.*

One Pickering Road
PO Box 7399
Rochester, NH  03839-7399

## PRIVILEGED AND CONFIDENTIAL

## REPORT NUMBER 1

DATE:          **December 2, 2005**

NEFCO#:  **040903181**

## THE ENCLOSED REPORT IS PROVIDED AS PRIVILEGED AND CONFIDENTIAL TO THE ADDRESSEE. RELEASE TO ANY OTHER COMPANY, CONCERN, OR INDIVIDUAL IS SOLELY THE RESPONSIBILITY OF THE ADDRESSEE.

| | |
|---|---|
| **ASSIGNMENT** | Instructions were received from Mr. Paul Dionne of Butterworth & O'Toole to conduct a cause and origin investigation |
| **TYPE OF LOSS** | Multi family residence |
| **DATE OF LOSS** | September 2, 2004 |
| **LOSS LOCATION** | 5 Foskett Avenue, Somerville, MA |
| **INSURED** | Timothy Stein / Wayne Rolf |
| **ALARM RECEIVED** | By the Somerville Fire Department at approximately 12:50 p.m. |

| **ENCLOSURES** |
|---|
| 1.  Photographs |



## SUMMARY

The fire was discovered simultaneously by the flooring contractors on the third floor of the residence. Fire was first observed at the third-floor level and in the stairwell area extending from the second to the third floors.

## CONCLUSION

| | |
|---|---|
| **Area of Origin** | Third floor and third-floor stairwell area |
| **Point of Origin** | Cannot be further narrowed beyond rear half of the third-floor area |
| **Cause** | The cause of this fire is the flammable vapors of a sealer being applied by the flooring contractors pooling and coming in contact with a competent ignition source at the third-floor level. There are multiple ignition sources at the third-floor level, including a gas range, an electric refrigerator, and HVAC equipment located in the attic area just above the kitchen. There were multiple electric lights and outlets throughout the residence. There is also evidence that some of the flooring contractors were cigarette smokers and the use smoking materials within this vapor cloud cannot be ruled out as an ignition factor. Proper ventilation was not provided and no steps were taken to extinguish pilot lights or terminate electricity to the area. |

## FIRE SCENE ANALYSIS

The conditions affecting the fire scene analysis are the overhaul and extinguishment efforts of the Somerville Fire Department as well as the previous cause and origin investigation conducted jointly by the Massachusetts State Fire Marshal's Office and the Somerville Fire Department.

Fire scene analysis began with an examination of the exterior of the structure beginning with the exterior front. Examination of the front of the structure reveals that the windows at the second- and third-floor levels have been vented and there is extensive fire and heat damage visible to the interior of the structure. The roof assembly here has also been heavily damaged and large portions of it consumed.

Fire scene analysis continued to the right side of the structure. Examination reveals extensive fire and heat damage to the third-floor level with the heaviest fire and heat damage appearing to be above the left rear quadrant of the third floor. Windows at the second- and third-floor levels have been vented and there is extensive fire and heat damage above the remaining components. Fire and heat damage here is consistent with a fire originating at the interior third-floor rear of the structure.

Fire scene analysis continued to the rear of the structure. An examination of the rear of the structure reveals extensive fire and heat damage to the third-floor level. The remaining portions of the roof assembly and rear wall display half of a V pattern that extends down to the left rear interior of the third floor.

Fire scene analysis continued to the left side of the structure. Examination reveals that the roof at the left side of the structure has, for the most part, been completely consumed by the fire. The windows at the second-floor level have been vented and the Nee wall at the third-floor level has been nearly completely consumed by fire. This damage is also consistent with the fire originating at the interior left rear quadrant of the third floor. It should also be noted that the weather head and service center cable are located near the left front corner of the structure and appear to be intact. It also should be noted that the electric meters had also been located at the left side near the front of the structure and these meters have been pulled. The remaining equipment is undamaged by fire. It also should be noted that the gas meters had been located at the left front corner exterior and had been removed prior to this investigator's inspection. Remaining components, including piping, all appear to be intact.

Fire scene analysis continued with an examination of the interior of the basement of the structure. The examination reveals that it is undamaged by heat and fire. The examination of the electrical equipment, including the fuse panels at each level, reveals that this equipment is undamaged by heat and fire including all the wires leading to and from them. The examination of the heating and hot-water equipment also located at the basement level reveals it is also undamaged.

Fire scene analysis continued to the entrance area located at the right front quadrant of the first floor. An examination here reveals that there is a battery-operated smoke detector at floor level here. This has fallen from the ceiling area just to the interior of the front entrance.

Fire scene analysis continued to the front porch area at the exterior of the structure. Located on the front porch is a Rigid brand vacuum cleaner which is believed to have been owned by the flooring contractors. The end of the power cord nearest the male plug has been damaged by heat and fire. This damage would be consistent with the cord from the vacuum cleaner having been located at the interior of the structure at the time of the fire.

Fire scene analysis continued to the interior of the first-floor apartment. An examination here reveals that this apartment is, for the most part, undamaged by heat and fire. Located at the rear of this apartment is a kitchen area and in this kitchen is a gas range. An examination of the gas range reveals that the valve at the rear of the range to be in the *On* position.

Examination of the kitchen sink in this first-floor apartment reveals that there are some latex painting supplies here including a tray and paintbrush that appear to have been being cleaned at the time of the incident. It has been reported that the homeowner had been in the rear hallway applying latex paint to the rear wall of the stairwell when he heard the commotion and

discovered one of the flooring contractors on fire.

Fire scene analysis continued to the second floor and the second floor apartment. This apartment although rented had been unoccupied at the time of the fire. Examination of the kitchen area in the rear of the second-floor apartment reveals that it too had been equipped with a gas range. The gas supply valve for this range is also found to be in the *On* position. It should be noted that there are battery-operated smoke detectors located throughout the second-floor apartment.

Fire scene analysis continued with an examination of the front stairway which reveals that it has suffered extensive fire and heat damage that increases in severity when one approaches the second-floor landing. The stairs that extended from the second-floor landing up to the third-floor apartment have been completely consumed by fire. This second-floor landing has been described as the location where the flooring contractor that perished in this fire had been discovered. It had also been indicated that the flooring contractors had just applied a sealer to the entire third-floor apartment floor area and they were working their way out, painting down these stairs at the time of the fire, when these flammable vapors contacted an ignition source.

The fire scene analysis continued with an examination of the third floor and the stairwell that extended from the second-floor landing to the third floor. Access to third floor was gained by the rear stairwell. Examination of the third-floor area reveals that it is clearly the most heavily damaged area and the fire and heat damage here is heaviest in the left rear corner or kitchen area. Delayering of each room and floor areas reveals that the fire and heat damage extends to the floor level in the kitchen and nearby areas. The bedroom located at the front of the third-floor area floor remains undamaged; it appears that the door to this front bedroom had been in the closed position at the time of the fire. It should be noted that the window in this front bedroom appears to have been in the *Up* position but this window would not have aided in venting the flammable vapors as this bedroom door had been in the closed position.

Fire scene analysis continued to the third-floor kitchen area. Examination here reveals that it was equipped with a Kenmore gas range and the gas valve for this range is also found to be in the *On* position. It should also be noted that this range appears to have been equipped with the standing pilot. Examination of an alcove located in the front wall of this kitchen reveals a full-sized refrigerator. This refrigerator is also found with its power cord energized at a duplex receptacle located at the rear of the refrigerator near floor level. There is heavy fire and heat damage extending to floor level in this alcove. It should also be noted that there is HVAC equipment located in the attic area just above the kitchen and this HVAC equipment is also gas-powered. There is extensive fire and heat damage to the roof assembly and attic area above the kitchen.

Fire scene analysis continued with an examination of the floor and stairwell areas - several samples were taken throughout the second- and third-floor stairwell areas as well as a portion of the undamaged bedroom floor. Multiple ignition sources have been viewed, including exhaust fans and light fixtures in the bathrooms in both the third- and second-floor levels and there is evidence that night lights had been located in the bathrooms.

Fire scene analysis continued with an examination of the exterior of the structure which reveals that there are multiple cigarette butts. These butts are found in the driveway area and street area in close proximity to where the flooring contractors' van had been parked at the time of the fire. It has been reported that several of these flooring contractors are cigarette smokers.

Fire scene analysis continued with an examination of two copies of the Yellow Pages found in the first-floor apartment. One is for the Cambridge area, the other for the Boston area. Both of carry an ad for the flooring contractor Dave's Floor Service.

Fire scene analysis concluded with the overall examination and interpretation of fire and burn patterns throughout the structure, which are consistent with a cloud of a flammable vapors produced by the application of lacquer sealer to the third floor and stairwells by employees of David's Floor Service encountering a competent ignition source and igniting. Additionally, an open five-gallon pail had been discovered at the base of this flight of stairs. It is the opinion of this investigator that the total consumption of the flight of stairs that extends from the second to the third floor resulted from the flash-fire or the vapor cloud ignition due to the contents of the lacquer sealer can having been unintentionally dumped on this flight of stairs. This action would have resulted in a heavy fire and heat damage to this stairwell.

## INVESTIGATION

On September 3, 2004, I conducted an interview with Mr. Wayne Fette, the partial owner of the property at Number 4 Foskett Avenue in Somerville, Massachusetts. Following is a summary of that conversation.

Mr. Fette indicated that he has resided here with Mr. Tim Stein for approximately ten years. The property has not been listed for sale in recent years. He has indicated he has had no previous fire losses and he describes his credit status as excellent. He further indicated there is no mortgage on the property. Mr. Fette described the property as a three-family residence. He indicated that the third floor is unoccupied, and had been in the process of having its floors refinished by Dave's Floor Service, Inc. on the day of the fire. Mr. Fette indicated that the second-floor apartment was occupied by Ms. Barbara Qurorro. He describes Ms. Qurorro as an excellent tenant. Mr. Fette indicated that the flooring contractors did arrive on the property at approximately 8:45 a.m. and he did allow two Vietnamese gentlemen into the property and they began their work at the third-floor level. He indicated that contact with these individuals was very limited as they had very little knowledge of the English language. He indicated that Mr. Timothy Stein did hire these contractors and he believes he located them in the Yellow Pages. Mr. Fette indicated that they were going to sand all of the hardwood floors of the third-floor level and they were also going to sand and refinish two flights of stairs. The flight of stairs extended from the second to third floor and the flight of stairs that extended from the first to the second floor in the front of the residence. Mr. Fette further indicated that after leaving the third floor, he began applying some latex paint to the rear stairwell of the residence. Mr. Fette indicated that at no time was the electricity to the residence terminated at any level. Mr. Fette further indicated

that all the apartments are equipped with gas stoves. There was also gas heating and cooling equipment located in the attic space above the third-floor kitchen. Mr. Fette indicated that approximately ten minutes after noon the gentleman who was helping him paint the rear hallway was getting cleaned up in the kitchen sink area when he heard the smoke detectors sound and he observed a large volume of black smoke. At that time he exited the rear of the house and traveled to the front of the house where he did observe fire at the third-floor level. He further indicated that he did see fire at the kitchen windows and that the windows did blow out. Mr. Fette described the windows as exploding or blowing out within 30 seconds of his exit to the backyard. He indicated that he saw windows explode and fire immediately extending out of them. Mr. Fette indicated that he believes these windows at the third-floor level were in the *Closed* position prior to the explosion. Mr. Fette indicated that during the morning hours he realized that additional flooring contractors were on scene. He thought there were at least three because he had noticed an individual he hadn't seen with the original two. Mr. Fette further indicated that after seeing fire at the third-floor level he did call 911 from his cell phone. He then traveled to the front of the residence where he described seeing three Vietnamese gentlemen, one was badly burned, one was screaming and one was in shock. He indicated that all three of these individuals were speaking in Vietnamese. Mr. Fette further indicated that an unknown individual showed up on the scene and turned out to be an off duty firefighter and he used the garden hose to cool down the one victim. He further indicated that he does not know the smoking habits of the flooring contractors.

On September 3, 2004, I had a conversation with Sergeant Robert Batchelder of the Massachusetts State Fire Marshal's Office via telephone. Sergeant Batchelder indicated that Trooper Cummings and he were involved in the investigation as to the cause of the fire on Foskett Street. Sergeant Batchelder indicated that the State Fire Marshal's Office determined the fire to be accidental in nature and specifically the result of the ignition of the flammable vapor cloud produced by the application of the lacquer sealer to the third-floor hardwood by the flooring contractors. He further indicated the exact ignition source cannot be pinpointed in his opinion but the most likely ignition source at third-floor level would be the pilot for a gas stove located in the left rear corner of the kitchen of third floor.

## DETERMINATION OF AREA OF ORIGIN AND CAUSE

The area of the origin of this fire cannot be further narrowed than the third floor rear of the structure and evidence available to establish the area of origin includes:

1.    The detailed fire scene analysis as conducted
2.    Analysis of fire and burn patterns throughout the structure all of which are consistent within the area of origin at this third floor level
3.    Analysis of fire and burn patterns of the third-floor level all of which are consistent with the fire originating in the rear half of the third floor
4.    The interview as conducted of Mr. Wayne Fette
5.    The review of deposition transcripts, exhibits, State Fire Marshal's report, Harco warnings, and discovery provided by Attorney Cullen.

The cause of this fire is the ignition of the flammable vapor cloud produced by the application of a highly flammable lacquer sealer to the freshly sanded wood floors at the third-floor level by the flooring contractors of David's Floor Service. Numerous competent ignition sources were identified  This sealer was applied without regard to directions, warnings or minimal safety standards  Evidence available to establish the cause of this fire includes:

1.  The detailed fire scene analysis is conducted

2.  Analysis of the fire and burn patterns throughout the structure all of which are consistent with the fire originating at this third-floor level

3.  Analysis of fire and burn patterns at the third floor all of which are consistent with the fire originating in the rear half of this third-floor area

4.  The analysis of the fire and burn patterns in this third-floor rear area and the analysis of competent ignition sources in the same area, those ignition sources would include but are not limited to a Kenmore gas stove which was found with its gas valve to be in the *On* position, it was also discovered that this stove is equipped with the standing pilot. A second competent ignition source located in the kitchen area is a full-size refrigerator. This was located in an alcove and it was found to be plugged in at a duplex receptacle to the rear of this refrigerator. The third competent ignition source in close proximity of the kitchen was the gas-fired HVAC equipment located almost directly overhead of the refrigerator in the confined space of the attic.

6.  The interview as conducted with Sergeant Batchelder of the Massachusetts State Fire Marshal's Office.

## RECOMMENDATIONS AND/OR COMMENTS

This report reflects the findings of this investigation as conducted to date. This investigator retains the right to alter or amend this report should further information become available and, as always, would be pleased to conduct additional analysis at your request.

                            Michael E. Hennessey
                            Fire Analyst

MEH/mfa
Enclosures